**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**Tracy Lynn Parkhurst, Trustee for the Heirs and Next of Kin of Miles Worner Jackson,**

**Plaintiff,**

**vs.**

**Advanced Correctional Healthcare, Inc.;**

**USA Medical & Psychological Staffing, S.C.;**

**Freedom Behavioral Health, Inc.;**

**Jessica Young, Jillian Bresnahan, PA-C, Heidi Gutierrez, RN, Melissa Caldwell, MD, Amber Fennigkoh, RN, Christopher Fear, RN, Joshua Cather, RN, Chelsea Sullivan, RN, Catherine Anderson, LPN, Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN, employees of Advanced Correctional Healthcare, Inc. and/or USA Medical & Psychological Staffing, S.C. and/or Freedom Behavioral Health, Inc., all in their individual and official capacities and as agents/employees of Advanced Correctional Healthcare, Inc. and/or USA Medical & Psychological Staffing, S.C. and/or Freedom Behavioral Health, Inc.,**

**Defendants.**

**Court File No.**

**COMPLAINT**
**WITH JURY DEMAND**

---

## INTRODUCTION

For her Complaint, Tracy Lynn Parkhurst, in her capacity as Trustee for the heirs and next of kin of Miles Worner Jackson, states and alleges as follows:

1. This is an action for money damages arising out of the July 3, 2023 in-custody death of Miles Worner Jackson, which resulted from violations of well-settled federal civil rights and state law.
2. By order dated May 7, 2024, Hennepin County District Court appointed Tracy Lynn Parkhurst ("Plaintiff") as Trustee for the Heirs and Next of Kin of Miles Worner Jackson.
3. It is alleged that the individual Defendants violated Mr. Jackson's constitutional rights under 42 U.S.C. §§ 1983, and the Eighth and/or Fourteenth Amendments to the United States Constitution and engaged in negligence and medical malpractice leading to wrongful death.

## JURISDICTION

4. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law pursuant to 28 U.S.C. § 1367.

## VENUE

5. This Court is the proper venue for this proceeding under 28 U.S.C. § 1391, as the material events and occurrences giving rise to Plaintiff's cause of action occurred within the State of Minnesota.

## PARTIES

6. Decedent Miles Worner Jackson ("Mr. Jackson") was at all material times a resident of the State of Minnesota and of full age and an inmate at the Anoka County Jail in Anoka, Minnesota. Mr. Jackson was 24-years-old when he died.
7. Plaintiff Tracy Lynn Parkhurst is Mr. Jackson's biological mother and has been appointed as Trustee for the heirs and next of kin of Miles Worner Jackson pursuant to Minn. Stat. § 573.02.

8. Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a corporate entity that, at all material times, was contracted by Anoka County to provide medical services for Anoka County Jail inmates under the color of state law. Defendant ACH, at all material times, employed Defendants Jessica Young, Jillian Bresnahan, PA-C, Heidi Gutierrez, RN, Melissa Caldwell, MD, Amber Fennigkoh, RN, Christopher Fear, RN, Joshua Cather, RN, Chelsea Sullivan, RN, Catherine Anderson, LPN, Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN.

9. Defendant USA Medical & Psychological Staffing, S.C., ("USAMP") is a corporate entity that is an affiliate and/or subsidiary of ACH that, at all material times, was contracted by Anoka County to provide medical services for Anoka County Jail inmates under the color of state law. Defendant USA Medical & Psychological Staffing, at all material times, employed Defendants Jessica Young, Jillian Bresnahan, PA-C, Heidi Gutierrez, RN, Melissa Caldwell, MD, Amber Fennigkoh, RN, Christopher Fear, RN, Joshua Cather, RN, Chelsea Sullivan, RN, Catherine Anderson, RN, Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN.

10. Defendant Freedom Behavioral Health, Inc., ("FBH") is a corporate entity that is an affiliate and/or subsidiary of ACH that, at all material times, was contracted by Anoka County to provide medical services for Anoka County Jail inmates under the color of state law. Defendant Freedom Behavioral Health, Inc., at all material times, employed Defendants Jessica Young, Jillian Bresnahan, PA-C, Heidi Gutierrez, RN, Melissa Caldwell, MD, Amber Fennigkoh, RN, Christopher Fear, RN, Joshua Cather, RN, Chelsea Sullivan, RN, Catherine Anderson, LPN, Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN.

11. Defendants Jessica Young (ACH President and CEO), Jillian Bresnahan, PA-C (ACH Vice President), Heidi Gutierrez, RN (Director of Medical Operations), Melissa Caldwell, MD

(Freedom Behavioral Health President), Amber Fennigkoh, RN (Regional Nurse Manager), Christopher Fear, RN (Regional Nurse Manager), Joshua Cather, RN (Regional Nurse Manager), Chelsea Sullivan, RN, Catherine Anderson, LPN, Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN, sued in their individual, official, and employee/agent capacities, were at all material times employed by Advanced Correctional Healthcare, Inc. and/or USA Medical & Psychological Staffing, S.C. and/or Freedom Behavioral Health, were assigned to provide and/or supervise medical care and services to inmates at the Anoka County Jail, including Mr. Jackson, and were acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota, and/or Anoka County. These Defendants may be referred to below as "individual ACH/USAMP/FBH Defendants."

## FACTS

**Mr. Jackson Suffers an Obvious Medical Emergency at Anoka County Jail and is Then Abandoned to Die by Jail Medical Staff.**

12. On June 30, 2023, at approximately 6:30 p.m., Mr. Jackson was booked into the Anoka County Jail in relation to a warrant in Anoka County District Court for failure to appear for a scheduled court hearing. Mr. Jackson was 24 years old at the time. He was transferred into the custody of Anoka County Jail from Hennepin County Jail and booked into the Anoka County Jail by Deputy Logan Taylor.

13. While in a holding cell waiting to be processed into the jail, Mr. Jackson vomited in the holding cell. He was moved to wet cell 141 and Detention Deputy Taylor notified medical staff that Mr. Jackson was undergoing fentanyl withdrawal.

14. During his intake into the Anoka County Jail, Mr. Jackson completed a medical intake questionnaire. The questionnaire indicated that Mr. Jackson was wearing an ankle brace for a

right foot injury but, more importantly, that he was withdrawing from daily fentanyl use. The form was marked for urgent referral to a registered nurse and was marked "COWS" which is shorthand for Clinical Opiate Withdrawal Scale monitoring. Both Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN, were on duty the night Mr. Jackson was admitted to the jail. During intake, a medical staff member briefly spoke to Mr. Jackson and inspected his ankle brace. However, he was not seen for an assessment of his opioid withdrawal syndrome, a life-threatening condition,[1] until over 24 hours later, at approximately 11:00 pm the next day.

15. During opioid withdrawal, patient symptoms are tracked using COWS (Clinical Opiate Withdrawal Scale) assessments.[2] COWS assessments are a series of eleven questions designed to evaluate the presence and seriousness of complications related to opioid withdrawal syndrome. Symptoms that are assessed include pulse, sweating, restlessness, pupil size, bone or joint aches, runny nose, gastrointestinal upset, tremor, yawning, anxiety or irritability, and gooseflesh skin.

16. To be effective, COWS assessments are performed by nurses at least once per shift, but more often if the individual is experiencing significant symptoms that require adjustment of the treatment protocol. Treatment involves monitoring vital signs, monitoring and correcting electrolyte imbalances, monitoring and maintaining hydration, and administering medications to manage symptoms. Symptomatic treatment in opioid withdrawal includes loperamide for diarrhea, promethazine for nausea/vomiting, hydroxyzine or other medications for anxiety,

---

[1] Opioid Withdrawal. https://www.ncbi.nlm.nih.gov/books/NBK526012/

[2] Clinical Opioid Withdrawal Scale, https://nida.nih.gov/sites/default/files/ClinicalOpiateWithdrawalScale.pdf

and ibuprofen for muscle pain. Clonidine can also be administered to reduce high blood pressure. The COWS scoring system is reproduced below:

| **COWS Scoring** | |
|---|---|
| **Score** | **Interpretation** |
| 5-12 | Mild opioid withdrawal |
| 13-24 | Moderate opioid withdrawal |
| 25-36 | Moderately severe opioid withdrawal |
| 36+ | Severe opioid withdrawal |

17. Despite the importance of COWS assessments in managing potentially life-threatening opioid withdrawal and despite Mr. Jackson displaying concerning symptoms that were reported by jail staff, he was not seen by medical staff for an assessment until more than 24 hours after jail admission.
18. Defendants Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN, had a duty to provide COWS assessments for Mr. Jackson (or order COWS assessments) at least every 4 to 6 hours during initial opioid withdrawal management or even hourly if Mr. Jackson was symptomatic, had a COWS score over 13, or was being actively induced onto withdrawal medications. However, Mr. Jackson was initially abandoned by ACH/USAMP/FBH medical staff, including Defendants Catherine McKeithen, RN, and Terah Hollen-McEnelly, LPN, for over 24 hours. Failure to provide an initial COWS assessment for Mr. Jackson for over 24 hours after his admission constitutes a major breach in the standard of care and deliberate indifference to Mr. Jackson's serious medical need related to acute fentanyl withdrawal.
19. On July 1, 2023, at approximately 11:00 p.m., Mr. Jackson was finally seen by Defendant Catherine McKeithen, RN, for an opioid withdrawal evaluation. Nurse McKeithen measured and recorded the following vital signs for Mr. Jackson: blood pressure of 126/63, pulse of 73, respiration of 20 breaths per minute, temperature of 97.8, and oxygenation of 100%.

20. Mr. Jackson's COWS assessment on July 1, 2023, revealed substantial withdrawal symptoms, including severe pain rated at 10/10, severe sweating, restlessness, moderately dilated pupils, substantial bone or joint aches, constantly runny nose or tearing, vomiting or diarrhea, tremors, and severe anxiety or irritability. Nurse McKeithen scored Mr. Jackson's COWS score as a 28, a moderately severe opioid withdrawal, and ordered medications for pain, anxiety, nausea, diarrhea and Mr. Jackson's other symptoms. Video shows Mr. Jackson bent forward as he walked to and from the medical unit, holding his abdomen.

21. Among serious complications of regular fentanyl abuse is Opioid Abuse Gastroenteropathy, a life-threatening condition that results in gastrointestinal ulcers and other complications.[3]

22. Mr. Jackson was once again abandoned by ACH/USAMP/FBH medical staff, including Defendant Nurse McKeithen, between 11:00 a.m. on July 1 and 8:40 a.m. on July 2. Despite Mr. Jackson having a COWS score of 28 and experiencing severe withdrawal symptoms, ACH/USAMP/FBH medical staff failed to provide any additional COWS assessments or medical monitoring for Mr. Jackson during this period. This again constitutes a major breach in the standard of care and deliberate indifference to Mr. Jackson's serious medical need related to acute fentanyl withdrawal.

23. On July 2, 2023, at 6:49 am, Mr. Jackson reported to Detention Deputy J. Vang that he was having difficulty breathing. Deputy Vang reported this to Defendant Nurses Anderson, and/or Sullivan, and/or McKeithen. Despite respiratory distress being a medical emergency, Defendant Nurses Anderson, and/or Sullivan, and/or McKeithen told Deputy Vang to "let IM Jackson know he is on the list to be seen and will be called at 0730 hours."

[3] Clinical profile and outcomes of opioid abuse gastroenteropathy: an underdiagnosed disease entity. https://pmc.ncbi.nlm.nih.gov/articles/PMC7206348/

24. Finally, at 8:40 a.m. on July 2, Mr. Jackson was called to the medical unit. Jail video shows Mr. Jackson having difficulty walking to the medical unit. He was bent forward holding his right side as he walked. At the elevator, he dropped to the floor while waiting for the elevator to arrive, then crawled onto the elevator and laid on the floor until it arrived at its destination. Once he arrived at the medical unit, he laid on the floor while waiting to be seen.

25. Mr. Jackson was seen in the medical unit by Defendant Chelsea Sullivan, RN. Nurse Sullivan documented that Mr. Jackson was seen for COWS withdrawal monitoring and was reporting abdominal cramping and difficulty going to the bathroom. Nurse Sullivan documented that Mr. Jackson was dehydrated. Nurse Sullivan took Mr. Jackson's vitals and recorded that Mr. Jackson now had a blood pressure of 95/59 and a pulse of 161. Nurse Sullivan recorded these vital signs on the same document and immediately below the prior day's vitals, which showed a blood pressure of 126/63 and a pulse of 73. Nurse Sullivan documented that she "will follow up with [Mr. Jackson] later this afternoon to recheck status and v[ital]s." Nurse Sullivan then released Mr. Jackson and sent him back to his cell.

26. Mr. Jackson's blood pressure of 95/59 was dangerously low and his pulse of 161 was extremely rapid. These are signs of the body's attempt to compensate for a very serious acute illness including severe dehydration, blood loss or severe infection leading to septic shock. These vital signs constituted a medical emergency requiring immediate transfer to an emergency room via ambulance for diagnosis and treatment. Moreover, Nurse Sullivan knew that Mr. Jackson had a relatively normal blood pressure and pulse less than 10 hours prior at 11:00 p.m. on July 1, and that he had now developed new symptoms of abdominal pain (characterized as "severe discomfort"), difficulty going to the bathroom, difficulty breathing, and inability to walk and maintain balance. Any competent nurse or even a layperson would

know that a person with a sudden drop in blood pressure to 95/59, a sudden pulse spike to 161, and other symptoms of severe abdominal pain, difficulty breathing, and difficulty walking and maintaining balance is suffering a life-threatening medical emergency and must be immediately transported to an emergency room for diagnosis and treatment.

27. In addition, Nurse Sullivan knew that Mr. Jackson was in the midst of severe acute fentanyl withdrawal and she knew that the sudden change in Mr. Jackson's vital signs indicated that Mr. Jackson was experiencing dangerous and life-threatening withdrawal complications. However, Nurse Sullivan ignored Mr. Jackson's life-threatening medical condition and failed to take any action to send Mr. Jackson to the emergency room for more advanced care. In fact, Nurse Sullivan failed to take any action to monitor, or arrange for monitoring, of Mr. Jackson's medical condition after 8:40 am on July 2, 2023. Further, she never followed up with Mr. Jackson despite her note stating she would do so. Nurse Sullivan's conduct constitutes medical incompetence, major breach in the standard of care, egregious deprivation of essential medical care, and deliberate indifference towards Mr. Jackson's objectively serious medical needs.

28. For the remainder of the day, Defendant Nurses Catherine Anderson, Chelsea Sullivan, and Catherine McKeithen knew that Mr. Jackson was at the jail experiencing a life-threatening medical emergency with extreme pain, dangerously abnormal vital signs, and trouble breathing while not receiving any medical care, monitoring, or follow up from any medical staff. Despite this information, Defendant Nurses Anderson, Sullivan, and McKeithen took no action to provide medical care or monitoring for Mr. Jackson or arrange for him to be taken to an emergency room or hospital for evaluation and treatment. Defendant Nurses Anderson, Sullivan, and McKeithen provided no medical care or monitoring whatsoever to

Mr. Jackson for the remainder of the day and did not recheck his vital signs even once. This conduct constitutes medical incompetence, major breach in the standard of care, egregious deprivation of essential medical care, and deliberate indifference towards Mr. Jackson's objectively serious medical needs.

29. At approximately 4:45 pm, Detention Deputy Taylor found Mr. Jackson unresponsive in his cell. Corrections staff began CPR. Nursing staff arrived, applied an automated external defibrillator and administered Narcan, a remedy for opioid overdose. Approximately 10 minutes later, an ambulance arrived and transported Mr. Jackson to Mercy Hospital.

30. At Mercy Hospital, Mr. Jackson was found to have a perforated stomach ulcer, a known complication of daily fentanyl use, with a large volume of gastric contents and infectious material leaked into his abdomen. The fluid in Mr. Jackson's abdomen led to abdominal compartment syndrome, which impaired his breathing and kidney function. Despite emergency surgery, Mr. Jackson never regained consciousness. He was declared deceased at the hospital on July 3, 2023.

31. Had jail medical staff Defendants acted on Mr. Jackson's serious symptoms and deteriorating condition by sending him to a hospital for more advanced care on the morning of July 2, 2023, his condition would have been diagnosed, he would have received the necessary medical treatment for his perforated ulcer, and he would have survived and recovered from his illness. As a direct result of the jail medical staff Defendants' failure to respond to Mr. Jackson's life-threatening medical emergency, Mr. Jackson's condition became fatal and Mr. Jackson died.

32. As a direct and proximate result of Defendants' actions, Mr. Jackson's medical needs were neglected and he endured physical and emotional/psychological pain and suffering,

ultimately resulting in his death and caused loss of life and related damages. As a direct and proximate result of Defendants' actions, Mr. Jackson's heirs and next of kin suffered damages enumerated in Minn. Stat. § 573.02, in an amount in excess of $75,000.

**Anoka County's Prior Contract with ACH/USAMP/FBH.**

33. In December 2021, Anoka County was seeking a new provider for jail medical services. Anoka County contacted Advanced Correctional Healthcare, Inc./USA Medical & Psychological Staffing, S.C./Freedom Behavioral Health ("ACH/USAMP/FBH").

34. After months of meetings and negotiations, Anoka County signed a contract with ACH/USAMP/FBH (the "contract"). The contract was to cover services in the adult jail, the juvenile detention center, and the workhouse. The start date for ACH/USAMP/FBH to provide services in the facilities was July 11, 2022.

35. On August 1, 2022, Jail Commander Sheila Larson asked which policies were to be followed—jail policies or ACH/USAMP/FBH policies. Heidi Gutierrez, RN, Director of Medical Operations for ACH/USAMP/FBH, replied that they don't have policies. She provided policies based on NCCHC[4] and recommended that Anoka County adopt them for the three facilities at issue – the jail, workhouse, and juvenile center.

36. Almost from the start, there were problems with the services provided to Anoka County by ACH/USAMP/FBH. On August 9, 2022, Nate Parker, Superintendent of the Juvenile Detention Center Lino Campus, wrote an email to other top leaders in Anoka Corrections outlining a "generalized list of failures," including the following: health assessments were late, nurses failed to review admissions screenings, sick call was not occurring in a timely manner, COVID testing was not being completed, medication passes were late, scheduling

[4] National Commission on Correctional Healthcare, https://ncchc.org/

was haphazard with a no call/no show nurse, and communication from ACH/USAMP/FBH was "HORRIBLE - upper management has been non-existent in this transition."

37. On August 11, 2022, only a month after the ACH/USAMP/FBH implementation, Administrative Lieutenant Carrie Wood sent an email to Heidi Gutierrez, RN, Director of Medical Operations for ACH/USAMP/FBH, requesting a meeting. In her email, Lt. Wood stated, "The transition is still not going as smooth as we had hoped. All three facilities have some concerns that we would like to discuss with you." Lt. Wood listed "Staffing concerns, Communication concerns, Policy vs Procedure, Medication passes at the Workhouse and Juvenile (shared staff), Admission screenings, [and] On-call procedures" as problems that all three sites wanted to have addressed.

38. On September 2, 2022, ACH/USAMP/FBH provided Anoka County with an accounting of hours of care provided under the contract during the period of 7/11/22 through 8/20/22. This accounting indicated that ACH/USAMP/FBH failed to provide 1,172.32 hours of registered nursing care to the jail, failed to provide 272.5 hours of registered nursing care to the workhouse, and failed to provide 152 hours of registered nursing care to the juvenile center. In addition, ACH/USAMP/FBH failed to provide 74.29 hours of mental health care to the jail. However, ACH/USAMP/FBH attempted to make up some of the missing hours by substituting more hours by medical records assistants and medical assistants—individuals who are paid less and wholly unqualified to provide nursing assessments or care.

39. On September 7, 2022, Lt. Wood sent an email to Commander Larson outlining several serious issues with the medical care being provided by ACH/USAMP/FBH. These concerns included the following: "No overnight nursing, all RN shifts end between 10:00 pm and midnight;" inconsistent staffing; poor communication; security issues; "no nurse is working

in the booking area doing the medical questionnaires or mental health screenings;" "no on-site mental health provider;" and "no decline in how many inmates are being sent out to the hospital." Lt. Wood also stated that "CMA's [Certified Medical Assistants] are passing meds when they aren't in our contract to even be working in our facility." A meeting was then held with ACH/USAMP/FBH where these concerns were discussed. A credit memo was issued for missing hours.

40. On November 8, 2022, an email exchange occurred between Occupational Health Specialist Honey Sternberg and Anoka County Jail administration regarding the release of inmates while they were on suicide watch. Ms. Sternberg suggested that inmates be held until a mental health provider could arrive at the jail. Jail administration Commander Larson replied that it is unlawful to hold inmates past their release period for medical or mental health reasons and that the remedy is "getting our facility fully staffed" and "having a nurse on the weekends and evenings."

41. On November 11, 2022, long-time Anoka County Jail nurse Melissa Neumann provided Lt. Wood with notes regarding poor care in the jail. Ms. Neumann outlined the lack of care for an inmate who came into the jail on November 9, 2022 in withdrawal from fentanyl and who had a history of seizures, but who was not seen by nursing until she had a seizure on November 11, 2022, and was then sent to the hospital where she was admitted. Ms. Neumann explained that she was "very upset" by the delay and that it was "unexcusable [sic]," stating, "She absolutely should have been seen today during the day if not last night to be put on meds to PREVENT seizures. ... She was not seen last evening or all day today." This same inmate had a severe ankle infection (MRSA) and was scheduled for amputation, but because she was not seen, she was not administered antibiotics or provided with crutches. Ms.

Neumann further explained that "it is not safe" for there to only be one nurse working on evening shifts, and that under-staffing causes the medication passes for inmates to end after 10 p.m. She then stated, "Quality care and keeping inmates safe and preventing Anoka County from lawsuits for poor medical care or avoidable medical mistakes is important to me!" Ms. Neumann also outlined the case of a man who was admitted to the jail on November 3, 2022 who reported daily heavy use of heroin and alcohol but who had not been seen for a withdrawal assessment as of November 11, 2022. She stated, "**My fear is that ACH does not check in with daily users, they wait for inmates to request to be seen for withdrawals.** Is it because we are short staffed and don't have time to see everyone who needs to be seen?" (emphasis added).

42. On November 17, 2022, a meeting was held with the upper management of the Lino Campus and Anoka County Workhouse and ACH/USAMP/FBH Regional Nurse Manager Amber Fennigkoh to again discuss the issues related to poor care and failure to meet contractual obligations by ACH/USAMP/FBH. A follow-up email after the meeting listed staffing issues with no overnight nursing, large gaps in mental health coverage, site supervisors not able to do their jobs because they were covering nursing shifts, no nurses in the booking area to provide initial medical and mental health assessments, lack of staffing for medication passes, especially for people with diabetes and seizure disorders, a lack of proper staff training, an ongoing lack of staffing at the workhouse, the failure of ACH/USAMP/FBH to sign off on policies, and billing and credit issues.

43. On November 22, 2022, Assistant Anoka County Attorney Nancy Norman Sommer wrote a letter to Jessica Young, Chief Executive Officer of ACH/USAMP/FBH, about "on-going service deficiencies," explaining that the issues discussed in the September meeting "have

not been resolved and in fact, have worsened." Attorney Nancy Norman Sommer stated, "Currently, and since the initiation of our contract, there has been no overnight nursing services provided at the jail," and "[t]here is still no nurse in booking to complete the medical and mental health questionnaires or providing initial assessments as necessary." Attorney Nancy Norman Sommer explained that hospitalizations had increased as a result: "The lack of medical care being provided has increased our use of hospitalizations. For example, our staff have marked intake notes with 'urgent' and still the clients are not being seen." She further outlined additional staffing issues at the jail, the workhouse, and the juvenile center; the failure of ACH/USAMP/FBH to sign off on policies; billing issues; and issues with adopting an electronic medical records system. Attorney Nancy Norman Sommer explained that "the lack of compliance with the contract terms have [sic] raised significant questions on our part relating to ACH's ability to perform the contracted services." Instead of addressing the issues outlined in the letter, Ms. Young wrote that the tone of the letter was hurtful to their team and asked, "Are we the right partner for you?" Attorney Nancy Norman Sommer responded that she did not mean for the document to sound hostile and stated that the County "would like to continue our partnership with ACH and look forward to working through the hurdles we've encountered to date." Ms. Young replied, "We want to get you the **good** media headlines." (emphasis in original).

44. On December 8, 2022, ACH/USAMP/FBH issued three additional credit memos to Anoka County for lack of staffing as required under the contract.

45. On December 22, 2022, Allison Miller, a licensed mental health professional working at Anoka County Jail, wrote to Ms. Sternberg and Dr. Melissa Caldwell about her "concern for the safety of the patients due to the insufficient communication. With the staffing shortage

and inconsistent medical staff providing care, a mode to effectively communicate urgent issues, concerns, procedures, expectations, etc, is a necessity. ... It was my impression that the issue would be addressed by leadership, as my continued concern was not being addressed despite attempts made. I feel this is a very pressing matter. Any assistance navigating this would be appreciated." Ms. Miller forwarded the email chain to Lt. Wood.

46. Emails on December 30, 2022 and January 3, 2023 document ACH/USAMP/FBH not performing sharps counts and not following other jail procedures.

47. An email on January 4, 2023 from Lt. Wood set the agenda for a January 5, 2023 meeting between Anoka and ACH/USAMP/FBH's Regional Nurse Manager Fennigkoh. The agenda documented a long list of items of concern with ACH/USAMP/FBH, including the lack of an onsite supervisor, nurses not documenting care or critical information for handoff to the next shift, not documenting vital signs, and not getting updates on inmates in the hospital. The agenda further stated, "Nurses are not reviewing the booking sheets and inmates are not being seen right away as needed or referred to Mental Health as needed. Example: DN jumped off the top tier, and if you look at his mental health questionnaire DD indicated there was concern." The notes taken at the January 5, 2023 meeting show that, regarding DN, the suicidal inmate, Lt. Wood stated, "Inmate indicated several issues at intake that would've flagged medical. ... [T[he correct process wasn't even in place." Ms. Fennigkoh replied, "I wasn't aware of the guy that jumped. The nurses should be calling me, even in the middle of the night, when incidents like that happen. That didn't happen with him." Lt. Wood then warned, "We are concerned about litigation. The nurses should be too for their own protection and license." Ms. Fennigkoh replied, "Agree."

48. On January 30, 2023, Attorney Nancy Norman Sommer wrote to Ms. Young about the continued nurse under-staffing, stating, "We contracted with ACH in good faith with the expectation that the nursing services would be provided. We are not receiving the nursing hours for which we are paying." Ms. Young replied the same day, stating, "As we discussed on 12/3/22, I don't think we are the right partner for Anoka County. I certainly don't expect Anoka County to work with a company it believes to be deficient, worsening, and noncompliant. Our contract calls for 90 days' notice of termination. Is that sufficient, or do you need more time? We don't want to leave you without a provider." Attorney Nancy Norman Sommer replied: "It was not our intention to cancel the contract, we are trying to work together to get the services we contracted for and ensure the safety of our clients and the integrity of the contract. It would almost certainly take Anoka more than 90 days to find an alternate provider in the event ACH cancels the contract." Anoka County chose to continue working with ACH/USAMP/FBH, but the quality of medical care at Anoka County Jail did not improve.

49. On March 19, 2023, an email from Nurse Neumann to ACH/USAMP/FBH Regional Nurse Manager Fennigkoh detailed that inmates were being taken out of Kevlar suits and not put on 15-minute suicide watch checks, with no documentation. She also explained that insulin was not ordered for diabetic inmates, that medication pass had ended at midnight, and that there was not sufficient documentation or follow-up for patients who refused to be seen, especially patients on CIWA and Clinical Opioid Withdrawal Scale ("COWS") assessments. She also described that an inmate "had a seizure this evening and ended up with a goose egg from landing on his head. He had missed doses of his anti-seizure medication because we ran out of his supply however we have stock of this medication and nurses had not been

administering it." Ms. Neumann concluded: "I am very frustrated by the lack of documentation. I can not [sic] do my job effectively and follow other nurses when they do not document what they have done with patients before I get here."

50. Throughout 2023, emails from Anoka County continued to show staff shortages and other medical care concerns. A July 25, 2023 email from Tracy Hammitt, ACH/USAMP/FBH Assistant Director of Medical Operations, to Lt. Wood detailed that there were still three full-time and two part-time nursing positions open. An email on August 1, 2023 from Lt. Wood to Anoka County Jail lieutenants and sergeants showed that the problems with ACH/USAMP/FBH continued to persist and to imperil inmates' health. Lt. Wood stated: "If you feel an inmates [sic] medical situation is getting worse and medical is not seeing them even though Detention staff and you have requested, please send them into the hospital to be evaluated." Lt. Wood further stated, "Please make sure that your staff are communicating if an inmate needs to be seen right away, there has been some miscommunication on Medical's part, they think they can get to them when they have some time and Detention staff are actually waiting for them to do the evaluation."

51. On August 9, 2023, Nurse Neumann emailed Commander Larson and Lt. Wood, explaining that she was fired the day before. She stated: "For the past 6 months ... I have been extremely concerned that something bad was going to happen with an inmate due to the lack of staff, lack of training, and lack of leadership that ACH has at the jail! This has been extremely concerning! ACH has hired inexperienced RN's, LPN's and because they are so short staffed, they throw them on shifts without trainers because there is no time to train them! I believe I was terminated because I HAVE raised concerns about the jail. ... I believe both deaths [of inmates] could have and should have been prevented. ACH does not like that I

have been brutally honest with them about the care they've given the Anoka County Jail inmates."

52. In May 2024, Nurse Neumann filed a lawsuit against ACH/USAMP with several other nurses, stating that ACH/USAMP terminated them in retaliation for their whistleblower activities. The nurses had reported that ACH/USAMP "were putting patients in danger of serious injury or death due to their failures and refusals to properly care for those patients." The lawsuit detailed that the nurses repeatedly reported that ACH/USAMP failed to provide adequate healthcare, had chronic understaffing, left urgent medical needs untreated, had missing or incomplete documentation, falsified medical documentation, and had a lack of training and supervision. The lawsuit also described that some medical staff refused or failed to answer patients' medical assistance calls. It detailed that ACH/USAMP failed to "schedule RNs on shifts, instead, using LPNs or no nurses at all," in violation of Minnesota state law. "For example, when a second patient died at Anoka County Jail in 2023, there were no RNs onsite, only two LPNs." A plaintiff in the lawsuit, Tracy Hammitt, who was fired in October 2023 when she was ACH/USAMP Regional Nurse Manager, stated in the complaint that she was forced to "attend a conference out of state despite her pleas that she remain at the Anoka site, due to ACH/USA[MP] understaffing Anoka. During her absence at the conference, an inmate at Anoka [County] died." The lawsuit documented that a jail deputy warned an ACH nurse that "[Cristian] Rivera-Coba looked 'awful,' and the nurse allegedly replied, 'They all look awful.'" The lawsuit stated that ACH/USAMP did not address the nurses' concerns about patients' safety, and instead retaliated against them through threats, intimidation, disciplinary actions, and termination.

53. On February 13, 2024, Commander Larson sent an email to Chief Deputy Bill Jacobson, who then forwarded it to Sheriff Brad Wise. It said, "I think I know why there are so many openings for ACH. ACH management gave supervisors one day to terminate all of their LPNs, to replace with RNs, so there was mass firing recently. It's related to the in custody deaths in 2023."

54. In an internal Anoka County text message on February 20, 2024, Commander Larson wrote that Anoka's provider told her she "has never seen ACH treat a customer as poorly as they treat us. This aligns with our belief that they want out of the contract and want us to do it." Commander Larson further explained that she was speaking to nurses who were planning to quit and were afraid they would be fired for saying something ACH/USAMP/FBH did not like.

55. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather were top-level officials and final policymakers for ACH/USAMP/FBH.

56. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that Anoka County Jail inmates were receiving constitutionally inadequate medical care from ACH/USAMP/FBH. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that ACH/USAMP/FBH were in a state of constant and ongoing breach of contract in terms of quality and quantity of medical care that was being offered to Anoka County Jail inmates. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that ACH/USAMP/FBH had failed to implement appropriate policies and procedures to ensure that Anoka County Jail inmates were receiving appropriate medical care. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew

that Anoka County Jail inmates were receiving deficient substance withdrawal monitoring and care from ACH/USAMP/FBH. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that Anoka County Jail inmates were receiving deficient mental health services from ACH/USAMP/FBH. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that Anoka County Jail inmates were receiving deficient suicide care and prevention services from ACH/USAMP/FBH.

57. Prior to July of 2023, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that Anoka County Jail inmates were at risk of serious bodily injury or death due to the deficiencies outlined above, and they had months to address the deficiencies by either providing appropriate staffing, policies, and training to medical staff employed at Anoka County Jail or terminating the contract such that Anoka County could find a suitable provider.

58. Mr. Jackson's death is part of a pattern of medical neglect of Anoka County Jail inmates by ACH/USAMP/FBH. Despite knowledge of these facts, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather failed to take any action to remedy the pattern of deficient medical care that was being provided to Anoka County Jail inmates by ACH/USAMP/FBH, resulting in the death of another inmate, Cristian Rivera Coba, just weeks later.

59. In sum, prior to Mr. Jackson's death, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that Anoka County Jail inmates were facing a substantial risk of serious bodily harm or death due to the deficient medical and mental health care that was being provided by ACH/USAMP/FBH and due to ongoing and pervasive breaches of

contract by ACH/USAMP/FBH. Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather failed to take appropriate action to address this substantial risk of serious bodily harm or death facing Anoka County Jail inmates, thereby causing and contributing to Mr. Jackson's death.

**Defendants Advanced Correctional Healthcare, Inc., USA Medical & Psychological Staffing, and Freedom Behavioral Health Have an Ongoing Custom, Pattern, and Documented History of Deliberate Indifference Resulting in Inmate Deaths, Coupled with Retaliation Against Medical Staff who Voice Concerns Regarding Deficient Medical Care.**

60. Courts have repeatedly addressed deaths and catastrophic injuries resulting from deliberate indifference in correctional facilities with deficient medical care provided by ACH/USAMP/FBH. Plaintiff identifies the following cases as examples:

61. *Strayer v. Dearborn County*, 4:12-cv-00098 (S. Dist. Ind.): In July 2011, while housed at the Dearborn County Jail, Mr. Strayer experienced worsening abdominal pain caused by an untreated hernia. ACH medical providers failed to act on repeated requests for care until Mr. Strayer could no longer walk. He ultimately required emergency surgery for a perforated duodenal ulcer and remained hospitalized for nearly 200 days. This case settled in February 2017.

62. *Watts v. Summit County*, 5:13-cv-00549 (N.D. Ohio): Mr. Watts developed severe abdominal pain while detained at the Summit County Jail in October 2011. His symptoms were misattributed to substance withdrawal, and he was denied diagnostic evaluation or meaningful treatment despite visible deterioration and pleas from other detainees. He died from a ruptured viscus with peritonitis secondary to peptic ulcer disease. The medical examiner concluded that the need for urgent medical intervention would have been apparent even to a layperson. The matter settled in April 2015.

63. *Jefferson v. Madison County*, 5:14-cv-01959 (N.D. Ala.): During her detention at the Madison County Jail in October 2013, Ms. Jefferson repeatedly complained of severe abdominal pain over an 11-day period. ACH personnel were aware of her condition but provided only laxatives despite escalating symptoms, including vomiting, syncope, loss of appetite, and inability to ambulate. Ms. Jefferson was never transported to a hospital. Nursing records mischaracterized her condition and omitted critical warning signs. Ms. Jefferson died from complications of an untreated bowel obstruction. This case settled in January 2024.

64. *Hailey v. Anderson County, et al.*, 3:15-cv-280 (E.D. Tenn.): When Mr. Sullivan arrived at the Anderson County Jail in 2014, he was unable to stand or care for himself. Nevertheless, an ACH nurse failed to perform a legitimate medical assessment and left him unattended in his cell. No meaningful evaluation occurred before his death. A subsequent investigation revealed that ACH was aware of the nurse's prior failures to conduct required assessments. The nurse was later charged with a felony for falsifying medical records related to Mr. Sullivan's death. This case resolved by settlement in February 2017.

65. *Nugent v. Franklin County*, 4:18-cv-02042 (E.D. Mo.): While incarcerated at the Franklin County Jail in November 2017, Mr. Nugent displayed clear symptoms of appendicitis, including severe abdominal pain, vomiting, and hallucinations. ACH staff failed to conduct adequate examinations, order diagnostic testing, or initiate treatment. Mr. Nugent's appendix ruptured and he died six days after his incarceration began. This litigation settled in April 2020.

66. *Copeland v. Richland County*, 23-cv-1517 (N.D. Ohio): At intake into the Richland County Jail in May 2022, Ms. Copeland advised ACH staff that she would be experiencing heroin withdrawal. She subsequently exhibited extreme withdrawal symptoms and delirium, but did

not receive appropriate medical care. Jail staff failed to monitor her vital signs for several days. She was later found unresponsive, with vomit present, and was pronounced dead approximately thirty minutes after being transported to a hospital.

67. *Pierce v. Itasca County*, et al., 22-cv-00441 (D. Minn.): ACH provided on-call medical services for Itasca County Jail and was repeatedly consulted over several days regarding Danica Winslow, who was unable to stand or ambulate, remained on the floor of her cell, urinated on herself, refused meals, and persistently requested hospital care. Despite knowledge of these conditions and abnormal vital signs, ACH clinicians declined to direct a hospital transfer and instead authorized continued housing in the jail. An ambulance was not called until hours after clear signs of medical decompensation were documented, at which point Ms. Winslow was diagnosed with septic shock. She died shortly thereafter. This litigation settled in 2025.

68. *Bush v. Advanced Correctional Healthcare, et al.*, 25-cv-310 (D. Minn.): On March 5, 2023, Melvin Bush developed severe abdominal pain while detained at the Olmsted County Adult Detention Center. Nurse Jacob Hanson, employed by ACH, examined Mr. Bush twice but took only partial vital signs. Mr. Bush continued to vomit bile, refuse medications, and repeatedly requested medical attention, while deputies observed his worsening condition. The same nurse conducted a second examination, which revealed a significantly elevated respiratory rate, but the nurse failed to take further action and left Mr. Bush suffering at the jail. Hours later, Mr. Bush was found unresponsive and transported to Mayo Clinic, where he was pronounced dead from complications of a perforated duodenal ulcer causing peritonitis and sepsis. This litigation is still pending.

69. *Hirsch v. Advanced Correctional Healthcare, Inc.*, 62-CV-24-1559 (Ramsey County District Court): In 2024, a group of ex-ACH employees filed a whistleblower/retaliation lawsuit against ACH alleging that ACH retaliated against them for voicing complaints pertaining to understaffing and deficient medical care provided to inmates at various jails across Minnesota. The plaintiffs in this litigation "repeatedly reported/complained about" ACH's "failure to provide adequate healthcare to patients," "chronic understaffing," "lack of training, leadership, or supervision," "violations of the Minnesota Nurse Practice Act," "violations of Department of Corrections policies relating to inmate care," "lack of consistent treatment of serious medical issues," and "refusal/failure to answer patients' sick/medical assistance calls." The plaintiffs in this litigation allege a pattern of "deliberate indifference toward patients in [ACH's] . . . care . . . [and] putting patients in danger of serious injury or death due to their failures and refusals to properly care for those patients." One of the named plaintiffs in *Hirsch* is Melissa Neumann, who is discussed above in connection with filing complains with Anoka County related to the unconstitutional treatment of Mr. Coba and other inmates prior to Mr. Coba's death. In response to the plaintiffs' complaints, ACH retaliated against them by "threats and intimidation," "negative evaluations, hostility and disciplinary actions, up to and including terminations and constructive discharge," and "order[s] . . . not to share . . . concerns about [ACH's] negligence . . . with jail administration." Ms. Neumann in particular "was terminated [by ACH] in retaliation for her whistleblowing activities."

70. To summarize, Defendants ACH/USAMP/FBH have a documented pattern, custom, and practice of neglecting inmates who are experiencing obvious and life-threatening medical emergencies, not only in Anoka County but across the State of Minnesota and nationwide.

Instead of addressing deficiencies, ACH/USAMP/FBH bully the agencies that dare to raise concerns, such as Anoka County, and retaliate against and terminate any employees who dare to complain, such as the Melissa Neumann and the other *Hirsch* plaintiffs.

## CLAIMS FOR RELIEF

### COUNT 1: 42 U.S.C. § 1983 – EIGHTH AND/OR FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE VIOLATIONS AGAINST ALL ACH/USAMP/FBH INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

71. Plaintiff incorporates by reference each of the above allegations as if stated fully herein.

72. Based on the above factual allegations, Defendants, through their actions and/or omissions, acting under the color of state law, violated Mr. Jackson's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution through their deliberate indifference towards Mr. Jackson's serious medical needs and their deliberate indifference to the serious risk of injury/death to Mr. Jackson.

73. Prior to Mr. Jackson's death, Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather knew that Anoka County Jail inmates were facing a substantial risk of serious bodily harm or death due to the deficient medical and mental health care provided by ACH/USAMP/FBH and due to ongoing and pervasive breaches of contract by ACH/USAMP/FBH. Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather failed to take appropriate action to address this substantial risk of serious bodily harm or death facing Anoka County Jail inmates, thereby causing and contributing to Mr. Jackson's death.

74. Defendant Nurses Sullivan, Anderson, McKeithen, and Hollen-McEnelly failed in their duties to provide timely COWS assessments for Mr. Jackson and abandoned him for hours while he was suffering life-threatening fentanyl withdrawal. When Defendant Nurses

Sullivan, Anderson, McKeithen, and Hollen-McEnelly learned that Mr. Jackson's condition had suddenly changed on the morning of July 2 and that Mr. Jackson had life-threatening vital signs and difficulty breathing, Defendant Nurses Sullivan, Anderson, McKeithen, and Hollen-McEnelly abandoned Mr. Jackson again and left him to die without any medical care and without arranging for him to be transported to the emergency room for treatment. Defendant Nurses Sullivan, Anderson, McKeithen, and Hollen-McEnelly had ample opportunity to send Mr. Jackson to the hospital where he would have received emergency medical care to save his life, but they instead chose to abandon him, thereby causing and contributing to Mr. Jackson's death.

75. As a result of these constitutional violations, Mr. Jackson and his heirs and next of kin suffered damages as aforesaid.

## COUNT 2: 42 U.S.C. § 1983 – EIGHTH AND/OR FOURTEENTH AMENDMENT (*MONELL*) VIOLATIONS AGAINST DEFENDANTS ADVANCED CORRECTIONAL HEALTHCARE, INC., USA MEDICAL AND PSYCHOLOGICAL STAFFING, S.C., FREEDOM BEHAVIORAL HEALTH, INC., AND ALL INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES

76. Plaintiff incorporates by reference each of the above allegations as if stated fully herein.

77. Prior to July 3, 2023, Defendants developed and maintained policies, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of persons in their care and custody, which caused the violations of Mr. Jackson's constitutional rights.

78. It was the policy, custom, and/or practice of Defendants to inadequately supervise and inadequately train their employees, including the individual ACH/USAMP/FBH Defendants, thereby failing to adequately prevent and discourage further constitutional violations.

79. It was the policy, custom, and/or practice of Defendants to fail to perform appropriate COWS assessments for inmates experiencing acute fentanyl/opioid withdrawal.

80. It was the policy, custom, and/or practice of Defendants to provide inadequate medical care for inmates exhibiting life-threatening symptoms of fentanyl/opioid withdrawal, such as severe abdominal pain, difficulty breathing, and life-threatening vital signs.

81. It was the policy, custom, and/or practice of Defendants to fail to train their employees, including the individual ACH/USAMP/FBH Defendants, on the proper COWS protocol for jail inmates.

82. It was the policy, custom, and/or practice of Defendants to fail to train their employees, including the individual ACH/USAMP/FBH Defendants, on the appropriate response to inmates experiencing fentanyl/opioid withdrawal syndrome.

83. It was the policy, custom, and/or practice of Defendants to provide inadequate medical care for inmates experiencing life-threatening medical emergencies.

84. As a result of these policies, customs, and/or practices, and/or lack of adequate training or supervision, employees of Defendants, including the individual ACH/USAMP/FBH Defendants, believed that their actions would not be properly monitored by supervisory employees and that misconduct would not be investigated or sanctioned, but would instead be tolerated.

85. As a result of these policies, customs, and/or practices, and/or lack of adequate training or supervision, employees of Defendants, including all individual ACH/USAMP/FBH Defendants, were not properly equipped to care for inmates with fentanyl/opioid withdrawal syndrome.

86. As a result of these policies, customs, and/or practices, and/or lack of adequate training or supervision, employees of Defendants, including the individual ACH/USAMP/FBH

Defendants, were not properly equipped to care for inmates experiencing life-threatening medical emergencies.

87. These policies, customs, and/or practices, and/or lack of adequate training or supervision were the cause of the violations of Mr. Jackson's constitutional rights alleged herein.

88. As a result of these constitutional violations, Mr. Jackson and his heirs and next of kin suffered damages as aforesaid.

**COUNT 3: MINN. STAT. § 573.02 – WRONGFUL DEATH CLAIM AGAINST ALL DEFENDANTS**

89. Plaintiff incorporates by reference each of the above allegations as if stated fully herein.

90. Based on the above factual allegations, Defendants Nurses Sullivan, Anderson, McKeithen, and Hollen-McEnelly committed medical malpractice against Mr. Jackson. Specifically, Defendants owed Mr. Jackson a duty and standard of care, as recognized by the medical community, to regularly perform COWS assessments, to monitor his vital signs and recognize abnormal values, to provide treatment for his acute fentanyl/opioid withdrawal, and to order Mr. Jackson to be taken to the emergency room on the morning of July 2 when he experienced trouble breathing with life-threatening vital signs. Defendants breached this standard of care and deprived Mr. Jackson of medical care that was necessary to save his life, resulting in his death.

91. Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather negligently caused Mr. Jackson's death. Specifically, these Defendants owed Mr. Jackson a duty and standard of care to address staffing, quality of care, and breach of contract issues in connection with their contracted correctional facility, the Anoka County Jail. Defendants Young, Bresnahan, Gutierrez, Caldwell, Fennigkoh, Fear, and Cather breached and departed from these duties and standards of care.

92. Defendants caused Mr. Jackson's wrongful death through deliberate indifference to his serious medical needs (as alleged in Counts 1 and 2 above) and/or medical malpractice and negligence (as alleged in the preceding paragraphs directly above).

93. Defendants Advanced Correctional Healthcare, Inc. and/or USA Medical and Psychological Staffing, S.C. and/or Freedom Behavioral Health are vicariously liable for the wrongful death caused by their employees/agents, the individual ACH/USAMP/FBH Defendants.

94. As a direct and proximate result of Mr. Jackson's wrongful death, Mr. Jackson's heirs and next of kin have suffered damages enumerated in Minn. Stat. § 573.02, in an amount in excess of $75,000.

**COUNT 4: MINN. STAT. § 573.01-573.02 – SURVIVAL ACTION AGAINST ALL DEFENDANTS**

95. Plaintiff incorporates by reference each of the above allegations as if stated fully herein.

96. Based on the above factual allegations, Defendants committed negligence, medical malpractice, and deliberate indifference against Mr. Jackson, which caused and resulted in his wrongful death.

97. Defendants caused Mr. Jackson to suffer pre-death physical/emotional pain and suffering, wrongful death, and loss of life and related damages.

98. Defendants Advanced Correctional Healthcare, Inc. and/or USA Medical and Psychological Staffing, S.C. and/or Freedom Behavioral Health are vicariously liable for the wrongful death caused by their employees/agents, the individual ACH/USAMP/FBH Defendants.

99. Notice is hereby given that Plaintiff intends to seek and recover all damages to the extent permitted under Minnesota state law, including, without limitation, pre-death pain and suffering damages as well as all other "damages suffered by [Mr. Jackson] . . . prior to [his] death." *See* Minn. Stat. § 573.02, subd. 1.

## RELIEF REQUESTED

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

a. Issue an order granting Plaintiff judgment against Defendants, finding that Defendants violated Mr. Jackson's constitutional rights under the Eighth/Fourteenth Amendments to the United States Constitution and that Defendants are liable to Plaintiff for all damages resulting from these violations, including damages for Mr. Jackson's conscious pain and suffering and loss of life and related damages;

b. Issue an order granting Plaintiff judgment against Defendants, finding that Defendants caused Mr. Jackson's wrongful death and that Defendants are liable to Plaintiff for all damages resulting from these violations (including, without limitation, pecuniary loss suffered by the next of kin, Mr. Jackson's pre-death pain and suffering damages, and all other "damages suffered by [Mr. Jackson] . . . prior to [his] death." *See* Minn. Stat. § 573.02, subd. 1 (2023));

c. Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

d. Award of punitive damages to Plaintiff against all Defendants, jointly and severally;

e. Award of reasonable attorney's fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988;

f. Award of such other and further relief as this Court may deem appropriate.

**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

THE LAW OFFICE OF ZORISLAV R. LEYDERMAN

Dated: May 22, 2026

By: s/ Zorislav R. Leyderman

ZORISLAV R. LEYDERMAN
Attorney License No. 0391286
Attorney for Plaintiff
The Law Office of Zorislav R. Leyderman
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (612) 876-6626
Email: zrl@ZRLlaw.com